Hessell Boschma and Louise Boschma v. Commissioner.
Boschma v. Commissioner
Docket No. 89977.
United States Tax Court
T.C. Memo 1965-63; 1965 Tax Ct. Memo LEXIS 268; 24 T.C.M. (CCH) 324; T.C.M. (RIA) 65063; March 24, 1965
Arthur R. Reibel, for the petitioners. Ronald S. Supena, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined the following deficiencies in income tax and additions to tax: Additions to Tax
1939 I.R.C.
1954 I.R.C.
Year
Deficiency
Sec. 293(b)
Sec. 294(d)(1)(A)
Sec. 6653(b)
Sec. 6654
1949
$ 641.10
$ 320.55
$ 57.71
1950
1,406.94
703.47
106.92
1951
3,581.96
1,790.98
321.66
1952
1,630.02
815.01
143.96
1953
5,143.72
2,571.86
471.75
1954
1,281.42
129.27
$ 640.71
1955
2,503.39
1,251.70
$11.92
1956
5,964.26
2,982.13
59.75
1957
2,405.69
1,202.85
*269 The issues are (1) whether petitioners had unreported income in each of the years 1949 through 1957 as computed by respondent under the net worth plus nondeductible expenditures method; (2) whether a part of the deficiency or underpayment of tax for each of the years 1949 through 1957 was due to fraud with intent to evade tax; (3) whether any of the years 1949 through 1957 is barred by the statute of limitations; and (4) whether petitioners are liable for additions to tax under section 294(d)(1)(A) of the Internal Revenue Code of 1939 for each of the years 1949 through 1954 and under section 6654 of the Internal Revenue Code of 1954 for the years 1955 and 1956. Findings of Fact Some of the facts were stipulated and they are so found. Hessell and Louise Boschma, husband and wife, are residents of Berkley, Michigan. They filed their income tax returns for all of the years here involved, except 1951, with the collector of internal revenue or the district director of internal revenue at Detroit, Michigan. They filed their 1951 income tax return with the collector of internal revenue at Jacksonville, Florida. Hessell Boschma will hereinafter be called the petitioner. *270 Petitioner and his wife had three daughters, Sue Ann, Peggy Louise and Gail, who were approximately 10, 6 and 3 years of age, respectively, in 1949. Petitioner listed all three of his daughters as dependents on his 1957 income tax return. Petitioner received a ninth grade education. He was 55 years old at the time of the trial. He was a general contractor during most of the period here involved, and he was engaged in the construction of school buildings, pumping stations and other state and municipal jobs. Petitioner's business office was in his home. About the years 1947, 1948 and 1949 petitioner was a building contractor in partnership with his brother, Renee D. Boschma. The partnership was terminated because of sharp dissensions between the brothers which resulted in litigation. In 1951 petitioner went to Florida to engage in the construction business. He constructed a motel in Florida consisting of two apartments and four rooms. Petitioner subsequently sold the motel in 1952 and returned to Michigan. Petitioner's 1953 income tax return was prepared by the Ernest Dahm Bookkeeping Service. The petitioner's 1952 return was not available to this bookkeeping office for the *271 purpose of continuing the treatment of certain items, such as inventory. Petitioner's returns for the years 1954 through 1957 were prepared by the Costello Tax & Bookkeeping Service. Petitioner reported adjusted gross income in his returns for the years 1949 through 1957 in the respective amounts of $2,789.86, $3,296.15, $3,251.36, $2,242.76, $3,801.34, $3,981.36, $5,695.91, $14,263.50 and $5,031.24. Respondent computed the petitioner's adjusted gross income for these years by the net worth plus nondeductible expenditures method, which showed the following understatements in petitioners' income for the years 1949 through 1957: Adjusted Gross Income
Net Worth
Petitioner's
Under-
Year
Method
Returns
statement
1949
$ 7,624.47
$ 2,789.86
$ 4,834.61
1950
11,551.16
3,296.15
8,255.01
1951
18,607.03
3,251.36
15,355.67
1952
10,892.16
2,242.76
8,649.40
1953
22,236.11
3,801.34
18,434.77
1954
10,715.57
3,981.36
6,734.21
1955
16,695.49
5,695.91
10,999.58
1956
$31,535.65
$14,263.50
$17,272.15
1957
15,510.28
5,031.24
10,479.04
Respondent subsequently made various adjustments in the net worth computation and on brief the computation, *272 as adjusted, was as follows: Taxable Years Ended December 31,
1948
1949
1950
1951
ASSETS: Bank accounts
$ 7,722.20
$ 6,006.45
$ 8,077.63
$ 2,472.82
Postal Savings
0
2,000.00
500.00
0
Accounts receivable -
7,302.55
6,994.51
3,800.00
0
Contracts trade
Other investment -
0
903.07
0
0
Partnership
Trucks and equipment
6,750.00
6,750.00
7,250.00
6,200.00
Automobiles
3,000.00
3,000.00
2,800.00
2,800.00
Personal residence
8,000.00
8,000.00
8,000.00
0
Capital improvements - Home
0
0
5,800.00
0
Adjustment - basis - home
0
0
0
0
Motel in Florida
0
0
0
25,990.00
Land
100.00
100.00
100.00
3,500.00
Residence, 28819 (N.E. Hwy.)
2,500.00
0
0
0
Commercial and rental
0
0
0
0
buildings
Improvements - 11 Mile Road
0
0
0
0
Land contracts
0
2,500.00
2,000.00
14,262.97
Furniture and appliances -
2,500.00
3,000.00
3,100.00
2,000.00
Personal
Jewelry - Personal effects
200.00
300.00
400.00
600.00
Miscellaneous equipment and
0
0
0
500.00
office equip.
Account receivable equipment
0
0
0
2,833.38
"Gladstone"
TOTAL ASSETS
$38,074.75
$ 39,554.03
$ 41,827.63
$61,159.17
LIABILITIES: Accounts payable - Work in
$ 4,955.81
$ 3,705.50
$ 500.00
$ 3,000.00
process
Accounts payable - Equipment
0
0
0
0
Other Liabilities -
0
563.33
0
0
Partnership
Accrued taxes and MUCC
68.90
500.00
0
0
Accrued payroll
0
0
0
0
Mortgages payable
0
0
0
7,905.99
Land contracts payable
0
0
0
0
Reserves for Depreciation -
3,650.00
3,450.00
4,500.00
2,163.33
Equipment
Reserves for Depreciation -
1,026.00
1,140.00
1,329.00
180.00
Buildings
TOTAL LIABILITIES
$ 9,700.71
$ 9,358.83
$ 6,329.00
$13,249.32
NET WORTH
$28,374.04
$ 30,195.20
$ 35,498.63
$47,909.85
Less: Net worth end of
28,374.04
30,195.20
35,498.63
preceding year
Increase in net worth
$ 1,821.16
$ 5,303.43
$12,411.22
Plus: Living expenses
4,450.00
5,068.87
6,231.13
Nondeductible personal losses
0
1,500.00
500.00
Total
$ 6,271.16
$ 11,872.30
$19,142.35
Less: Nontaxable portion of
0
0
65.50
long-term capital gain
Adjusted gross income
$ 6,271.16
$ 11,872.30
$19,076.85
corrected
Adjusted gross income per
2,789.86
3,296.15
3,251.36
return
Understatement
$ 3,481.30
$ 8,576.15
$15,825.49
*273 Taxable Years Ended December 31,
1952
1953
1954
ASSETS: Bank accounts
$ 4,411.88
$ 11,934.48
$ 1,755.34
Postal Savings
0
0
0
Accounts receivable -
2,727.64
29,372.28
6,296.57
Contracts trade
Other investment -
0
0
0
Partnership
Trucks and equipment
28,823.00
23,832.25
26,632.25
Automobiles
3,119.00
3,119.00
3,119.00
Personal residence
15,000.00
15,000.00
38,000.00
Capital improvements - Home
0
0
3,000.00
Adjustment - basis - home
(2,140.00)
(2,140.00)
(2,140.00)
Motel in Florida
0
0
0
Land
7,245.00
7,245.00
0
Residence, 28819 (N.E. Hwy.)
0
0
0
Commercial and rental
0
2,600.00
6,550.00
buildings
Improvements - 11 Mile Road
0
0
0
Land contracts
11,225.22
6,496.32
0
Furniture and appliances -
2,500.00
2,700.00
$ 3,000.00
Personal
Jewelry - Personal effects
800.00
800.00
900.00
Miscellaneous equipment and
500.00
500.00
500.00
office equip.
Account receivable equipment
1,500.10
0
0
"Gladstone"
TOTAL ASSETS
$ 75,711.84
$101,459.33
$ 87,613.16
LIABILITIES: Accounts payable - Work in
0
$ 11,921.44
$ 2,000.00
process
Accounts payable - Equipment
$ 12,184.40
4,873.76
0
Other Liabilities -
0
0
0
Partnership
Accrued taxes and MUCC
100.00
900.00
200.00
Accrued payroll
100.00
400.00
0
Mortgages payable
10,650.73
9,895.97
5,957.77
Land contracts payable
0
1,307.29
930.00
Reserves for Depreciation -
2,560.00
4,716.95
10,321.19
Equipment
Reserves for Depreciation -
0
0
0
Buildings
TOTAL LIABILITIES
$ 25,595.13
$ 34,015.41
$ 19,408.96
NET WORTH
$ 50,116.71
$ 67,443.92
$ 68,204.20
Less: Net worth end of
47,909.85
50,116.71
67,443.92
preceding year
Increase in net worth
$ 2,206.86
$ 17,327.21
$ 760.28
Plus: Living expenses
7,373.16
6,430.06
7,079.00
Nondeductible personal losses
1,000.00
0
0
Total
$ 10,580.02
$ 23,757.27
$ 7,839.28
Less: Nontaxable portion of
0
0
0
long-term capital gain
Adjusted gross income
$ 10,580.02
$ 23,757.27
$ 7,839.28
corrected
Adjusted gross income per
2,242.76
3,801.34
3,981.36
return
Understatement
$ 8,337.26
$ 19,955.93
$ 3,857.92
*274 Taxable Years Ended December 31,
1955
1956
1957
ASSETS: Bank accounts
$ 8,886.03
$ 7,231.73
$ 7,864.74
Postal Savings
0
0
0
Accounts receivable -
17,000.00
33,327.02
46,951.23
Contracts trade
Other investment -
0
0
0
Partnership
Trucks and equipment
28,612.25
49,302.29
52,312.00
Automobiles
3,119.00
3,119.00
3,119.00
Personal residence
24,433.55
24,433.55
24,433.55
Capital improvements - Home
1,000.00
2,000.00
2,000.00
Adjustment - basis - home
(2,140.00)
(2,140.00)
(2,140.00)
Motel in Florida
0
0
0
Land
0
0
0
Residence, 28819 (N.E. Hwy.)
0
0
0
Commercial and rental
10,000.00
25,500.00
25,500.00
buildings
Improvements - 11 Mile Road
0
0
500.00
Land contracts
$ 13,826.05
12,736.87
12,212.06
Furniture and appliances -
3,400.00
3,700.00
3,900.00
Personal
Jewelry - Personal effects
1,100.00
1,200.00
1,300.00
Miscellaneous equipment and
800.00
1,400.00
1,600.00
office equip.
Account receivable equipment
0
0
0
"Gladstone"
TOTAL ASSETS
$110,036.88
$161,810.46
$179,552.58
LIABILITIES: Accounts payable - Work in
$ 10,500.00
$ 23,387.44
$ 32,277.51
process
Accounts payable - Equipment
0
4,812.67
2,520.00
Other Liabilities -
0
0
0
Partnership
Accrued taxes and MUCC
500.00
600.00
1,244.80
Accrued payroll
200.00
200.00
235.00
Mortgages payable
5,611.80
5,248.14
4,866.17
Land contracts payable
600.00
6,630.17
6,270.75
Reserves for Depreciation -
15,375.94
20,444.27
26,425.01
Equipment
Reserves for Depreciation -
164.00
353.00
967.00
Buildings
TOTAL LIABILITIES
$ 32,951.74
$ 61,675.69
$ 74,806.24
NET WORTH
$ 77,085.14
$100,134.77
$104,746.34
Less: Net worth end of
68,204.20
77,085.14
101,134.77
preceding year
Increase in net worth
$ 8,880.94
$ 23,049.63
$ 3,611.57
Plus: Living expenses
7,924.00
9,616.34
11,021.84
Nondeductible personal losses
0
0
0
Total
$ 16,804.94
$ 32,665.97
$ 14,663.41
Less: Nontaxable portion of
0
0
0
long-term capital gain
Adjusted gross income
$ 6,804.94
$ 32,665.97
$ 14,633.41
corrected
Adjusted gross income per
5,695.91
14,263.50
5,031.24
return
Understatement
$ 11,109.03
$ 18,402.47
$ 9,602.17
*275 A part of the deficiency or understatement of tax for each of the years 1949 through 1957 was due to fraud with intent to evade tax, and the returns for these years were false and fraudulent with intent to evade tax. Opinion In view of the fragmentary and wholly inadequate nature of such books and records as were maintained by petitioner, we are satisfied that respondent was justified in resorting to the net worth method in computing petitioner's income for the period in controversy. Morris Lipsitz, 21 T.C. 917, affd. 220 F. 2d 871; Frank Imburgia, 22 T.C. 1002. Petitioner's books, we feel, would be totally inadequate for the purpose of correctly computing his income for those years. Petitioner also argues that he kept his books and records for the years 1949 through 1957 on the cash basis of accounting and filed his returns on that basis, and that respondent improperly changed that method from a cash to an accrual method of accounting by including petitioner's accounts receivable and payable in the net worth computation. Petitioner's argument presupposes an accurate and complete set of books, consistently kept on one method of accounting *276 or another, with his returns based on the method of accounting employed in his books. See section 41 of the Internal Revenue Code of 1939 and section 446 of the Internal Revenue Code of 1954. In that event the distinction between a cash and an accrual method of accounting should be maintained by the respondent in preparing his net worth computation. Otherwise, income will be shifted from one year to another, and a comparison of the net worth computation with the income as shown on petitioner's returns would show discrepancies in the annual income figures which would be brought about solely because of the difference in accounting methods. Here we not only are confronted with books and records which are fragmentary and meaningless from the standpoint of establishing a consistent method of accounting, but the record also indicates that these books and records were in some instances not even relied upon in preparing the income tax returns for some of the years here involved. An employee of the accounting service that prepared petitioner's returns for the years 1954 through 1957 testified that they relied largely on bank statements and check stubs. This same witness *277 also testified that he was unfamiliar with some of the petitioner's books and records which were introduced in evidence at the trial. It is also undisputed that the 1953 records, such as they were, were not kept on a cash basis. On this record we believe that petitioner's argument that respondent, in his net worth computation, changed petitioner's method of accounting from a cash to an accrual method of accounting is completely groundless. Many of the items and amounts used by respondent in the net worth computation are based upon stipulated facts, bank accounts in various banks, documentary evidence such as contracts, invoices, letters and financial statements, and testimony received at the trial. There can be no real dispute as to these items, which are amply supported by the record, and we believe it will be necessary only to examine those items and accounts to which petitioner takes exception. Respondent has not included any opening cash on hand in his net worth computation as of December 31, 1948, nor does he show any cash on hand at the end of any of the years 1949 through 1957. Petitioner merely argues on brief that "at the beginning of the net worth period he possessed *278 cash in the approximate amount of $2,000.00 to $3,000.00." Petitioner's testimony on this is vague. He testified that he usually carried sums of money with him to purchase supplies on out of town jobs or for bidding purposes and that at the end of 1948 he "might have had two or three thousand dollars * * * according to the size job that [he was] doing." But even if we should accept this, it will not prove useful to petitioner, since his explanation about the need for carrying cash would be equally true for other years. There is nothing at all to indicate that this amount of cash on hand varied at the end of each of the years here involved, and consequently the inclusion of an opening cash figure of two or three thousand dollars, together with similar cash amounts in the subsequent years, would not have any effect on the changes in petitioner's net worth in any of the years here involved. [1] We sustain respondent on this item. Petitioner disputes the correctness of the amount of trucks and equipment used by respondent at the opening of the net worth *279 period, December 31, 1948. Respondent shows an opening amount of $6,750 for trucks and equipment, while petitioner contends that, as of that time, he owned trucks and equipment with a "cost valuation" of approximately $23,000 to $28,000. Respondent derived the $6,750 figure largely from information supplied by the petitioner, who informed the revenue agent that, as of December 31, 1948, he had a used Northwest crane and bucket acquired on January 1, 1947 at a cost of $3,250, and a pick-up truck which he had acquired on July 1, 1946 at a cost of $1,500. In the absence of any records or any other sources indicating the ownership of other equipment, respondent also showed small tools at a cost of $2,000, or a net undepreciated amount of $1,000. Petitioner now claims that during the years 1946 through 1948 he was accumulating equipment to enter the ready-mix cement business; that as of 1948 he had been engaged in the construction business for several years and had accumulated extensive equipment for that business; and that at the beginning of the net worth period the ready-mix cement equipment and the construction equipment consisted of the following items: (a) four trucks, (b) two *280 cement paving machines, (c) piling, (d) sheet piling, (e) pile drivers with leads and heads, (f) air hammers, (g) two bulldozers, (h) tractors, (i) Butler binds and scales, (j) portable cement mixing plant, (k) crane with two buckets, (l) transit mix machine, (m) miscellaneous small tools, and (n) a business automobile. Petitioner relies upon the testimony of a witness who, in 1948, was a supplier of ready-mix cement on some of petitioner's jobs, to establish that petitioner owned the above listed items of equipment at the end of 1948. This witness admitted on cross-examination that he knew this equipment "was in his [petitioner's] possession, but that's all." It must be kept in mind that the task of the petitioner is to show his cost of such equipment as of the end of 1948, and to do this we must have some reliable evidence as to the original acquisition cost of the equipment as well as the time of acquisition so that we may find the undepreciated cost of this equipment on December 31, 1948. The testimony of petitioner's witness was extremely unsatisfactory with respect to this requisite information. He made no serious pretense to know when the equipment was acquired by petitioner. *281 As to the cost of the various items, his evidence consisted largely of guesses as to what similar equipment would cost if purchased new (presumably in some prior year). We do not know whether this equipment was purchased new by petitioner or in a used condition. In connection with the condition of the equipment, we were informed by this witness that the trucks "were all pre-war trucks * * * seven or eight years old"; that the pile driver and the Butler bins were also anywhere from seven to nine years old; and that the portable bin was in "pretty fair shape". Finally, this witness testified that the value of this equipment (not including the small tools) in 1948 was $25,000 to $28,000. Petitioner also offers the testimony of a former employee (who was employed by petitioner in 1946 and 1947 but did not actually recall whether he was still employed by the petitioner in the last few months of 1948) who stated that during his employ he operated a Northwest crane, a bulldozer, a paver, trucks, a transit-mix and other equipment. This witness candidly admitted he was "just the operator" and that he "wouldn't have any idea" as to the value of the machinery. We also have the testimony *282 of petitioner's brother, Renee, who was in partnership with petitioner in 1948 and was familiar with the trucks and equipment on hand as of December 31, 1948. Renee testified that petitioner purchased a used paver, a 1925 or 1927 model, sometime before 1948 for an amount of not more than $500. Renee stated that petitioner owned an old International truck about 1945, which he had purchased for "around $400", and when asked whether petitioner still owned it at the end of 1948, Renee testified that "I never did see it there." Renee did not recall that petitioner owned a General Motors truck as of December 31, 1948. He testified that petitioner owned one or more Butler bins in pood condition that "would be worth about $1,000", and that he owned a pile driver in good condition worth around $300, with a hammer attachment that had cost petitioner about $100. The shortcomings of the evidence before us are obvious as to the cost of the various items, when they were purchased, or their useful lives. Most of the amounts given in evidence are wholly unconvincing, and seem to be valuation figures rather than cost figures. However, we are persuaded that petitioner did have trucks and equipment *283 as of December 31, 1948 in excess of $6,750 (cost). We have done our best with the testimony at hand, and, applying the principles of Cohan v. Commissioner, 39 F. 2d 540, we find that the amount for trucks and equipment as of December 31, 1948 should be increased by $1,500. Petitioner argues that the respondent overstated the trucks and equipment account by $5,700 as of December 31, 1952. This account appears on the net worth statement as of the end of 1952 in the amount of $28,823 which includes, among other items, an Insley dragline crane in the amount of $15,788 and a Browning crawler crane in the amount of $5,700. Petitioner contends that he purchased the Insley crane in December 1952 and traded in the Browning crane, and that it was therefore incorrect to show both items in the trucks and equipment account as of December 31, 1952. There is in evidence, however, petitioner's income tax return for 1953 which shows, in an attached schedule, that a Browning crawler crane, which had been purchased on December 5, 1952 at a cost of $5,700, was sold on January 5, 1953 for $4,500, with a realized loss of $1,105 (adjusted basis was $5,605 at date of sale). It is obvious, *284 therefore, that this Browning crane was on hand as of December 31, 1952 and that it was properly included in the trucks and equipment account as of that date. We find the evidence sustains respondent as to this item. Petitioner makes some argument that respondent failed to allow him any credit for certain contingent liabilities at the end of all of the years here involved. This contention is without merit. It is enough to say that such contingent liabilities can be given full effect in a net worth computation in the taxable year when, if ever, they become definite obligations of the taxpayer. There is no evidence in the record to support petitioner's cursory argument on brief that the respondent made erroneous adjustments in the depreciation of the various assets over the years involved. On the contrary, the available evidence serves to support respondent's computations of depreciation, and we so find. Petitioner argues that respondent overstated the living expenses of petitioner's family of five over the years here involved. Respondent showed the following living expenses in the net worth statement for the years 1949 through 1957, respectively: $4,450, $5,068.87, $6,231.13, *285 $7,373.16, $6,430.06, $7,079, $7,924, $9,616.34 and $11,021.84. Petitioner estimates that his family's living expenses for these same years (1949 through 1957) were, respectively, $2,400, $2,600, $2,800, $3,000, $3,200, $3,400, $3,600, $3,800 and $4,000. We have considered all of the testimony on this issue, including the revenue agent's rather lengthy analysis of the items he considered in reaching his estimates. Petitioner merely states on brief that for all the years involved his family "lived in a modest economical manner"; that he owned his own home; had no personal home mortgage payments and that his social life was limited. We think that petitioner's estimates are too low, and that the automatic increment of $200 in annual living expenses over the years is highly artificial and bears little relationship to the facts. Respondent, on the other hand, while making a conscientious effort to get a truer picture, was necessarily forced to make estimates in nearly all the categories of expenditures which resulted, we believe, in annual living expenses which were too high. No precise determination can be expected in resolving this question. We have considered, in making our finding, *286 all of the evidence, including the expenses involved in going to Florida in 1951 and returning to Michigan in the following year, medical expenses shown by the record, petitioner's three growing daughters, increased expenditures in the latter years for educational purposes and indications as to the style of living enjoyed by petitioner and his family. On the basis of the entire record we find that the living expenses for petitioner's family in the years 1949 through 1957 were, respectively, $4,000, $4,500, $5,500, $5,750, $5,000, $5,500, $6,000, $6,250 and $6,500. Respondent included petitioner's residence in the net worth statement as of December 31, 1948 in the amount of $8,000 and as of December 31, 1955 through 1957 in the amount of $24,433.55. Respondent also showed home improvements in 1950 in the amount of $5,800. There is no satisfactory evidence in the record to show these amounts to be erroneous. The $8,000 figure and the $5,800 figure were based upon information obtained from petitioner, while the amount for the later years is supported by the petitioner's own records. Petitioner also states that the amounts used for various parcels of real estate, including commercial *287 and rental buildings, are in error. Petitioner's evidence on these properties is negligible and, on the basis of the record, we can see no justification for disturbing the cost figures used by respondent. We might add that the respondent's cost figures for the commercial and rental building as of December 31, 1954 through 1957 are, if anything, supported by information on petitioner's returns as well as by information obtained from the petitioner. We sustain the respondent as to these various items. Respondent determined that a part of the deficiencies or underpayments of tax for each of the years 1949 through 1957 was due to fraud with intent to evade tax. The burden rests upon the respondent to prove fraud by clear and convincing evidence, Arlette Coat Co., 14 T.C. 751, and we believe he has met that burden for each of the years involved. The consistent and substantial understatement of income over a period of years is evidence of fraud. Holland v. United States, 348 U.S. 121; Schwarzkopf v. Commissioner, 246 F. 2d 731. There are other indicia of fraud in the record. Petitioner's reluctance to keep accurate and revealing books and records *288 with the design of obscuring his true income is shown by the testimony of Renee Boschma, petitioner's partner during the earliest portion of the years here involved. [2]
*289 We also find evidence of specific omissions of income from the returns filed by petitioner. His 1949 and 1950 returns show a net business profit of $2,789.86 and $2,424.15, respectively, yet the evidence shows that the petitioner's share of the net profit of the partnership was appreciably in excess of these amounts. Financial statements prepared by a certified public accountant in 1949 and 1950 show a net partnership profit of $21,032.55 for the period from July 27, 1948 to October 31, 1949, and a net profit of $11,820.43 for the period of about a year ending August 20, 1950. In his 1953 return the petitioner omitted receipts totaling $6,201 (checks in the amounts of $5,123 and $1,078, dated August 1, 1953 and October 2, 1953, respectively) [*] a construction job. Petitioner also [*] from his 1957 return the sum of about $3,800 received on a construction job. Petitioner admitted at the trial that he had told the revenue agent that this amount was not reported on petitioner's 1957 return. Petitioner also omitted from his returns for 1951 through 1954 approximately $1,500 of interest income received by him during those years in connection with two deferred payment sales of assets *290 made by him. We hold, on the basis of all the evidence, that a part of the deficiencies or underpayments of tax for each of the years 1949 through 1957 was due to fraud with intent to evade tax within the meaning of section 293(b) of the Internal Revenue Code of 1939 and section 6653(b) of the Internal Revenue Code of 1954. Our finding that the returns with respect to the years here involved were fraudulent disposes of the statute of limitations issue raised by petitioner with respect to the years 1949 through 1953. Petitioner has introduced no evidence to show error in respondent's determination of additions to tax under section 294(d)(1)(A) of the Internal Revenue Code of 1939 and section 6654 of the Internal Revenue Code of 1954 for the years 1949 through 1956. We sustain respondent on this issue. Decision will be entered under Rule 50. Footnotes
1. Petitioner was asked whether he had any cash on hand at the end of 1957, and he testified: "Oh, I might have had cash, sure."↩
2. A portion of Renee's testimony appears as follows: Q. Did Mr. Hessell Boschma, your brother, ever make any statements to you with respect to the payment of taxes or keeping books with respect there to? A. Well, the only remark that I can recall is: When you're in business for yourself, why there is a lot of expenses that can be taken and wiped off on the books and be tax free. That's about the only thing. The testimony of Renee's wife, Dorothy, is also revealing: Q. Did Mr. Hessell Boschma ever make any statements to you with regard to keeping records? A. Well, we used to argue about it. My husband and I felt - We thought they should keep books and he didn't, and I said, "Well, what would you do, or how do you keep your records?" And he said, "I just throw them in a barrel." Q. And was there any further comment made with relation to the possible tax consequences? A. Well, I asked him what he would ever do if they ever checked and he said, "Well, if they come and check my records, I'll just tell them to get in there and dive in and find them."↩